# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEOFFREY I. ROBERTS, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) CIVIL ACTION NO. |
| v. | ) ) Judge ) |
| E.I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY FC, LLC, AND 3M COMPANY. | ) ) **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** ) ) ) |
| Defendants. | |

Plaintiff, Geoffrey I. Roberts, individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges upon information and belief, as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiff, Geoffrey I. Roberts, individually and on behalf of all others similarly situated, brings this action for damages and injunctive relief arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of E. I. DuPont de Nemours and Company ("DuPont"), The Chemours Company FC, LLC ("Chemours") and 3M Company ("3M")(collectively "Defendants") in connection with the contamination of Plaintiff's property with perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") (collectively "PFOS/PFOA" or "PFAS.")

2.     For over 100 years DuPont owned and operated the Chambers Works chemical manufacturing plant located in Pennsville and Carneys Point Townships, in Salem County, New Jersey ("Chambers Works" or the "Site").  During that time, DuPont released over 100 million pounds of hazardous waste into the soil and groundwater, which has now migrated to the Delaware

River to the west, the Salem Canal to the south, environmentally sensitive areas to the north and residential neighborhoods to the east as far away as 5 miles from the Site. Carneys Point has calculated it will cost $1.126 billion to clean up the Site and the surrounding areas. The New Jersey Department of Environmental Protection ("DEP") has determined it will take 999 years to complete the cleanup at the rate DuPont and/or Chemours is currently addressing the situation.

3.  The contamination at issue occurred in connection with DuPont's manufacturing, production, processing, recycling, use, release, discharge and/or disposal of PFOA and PFOS at and/or otherwise attributable to the Chambers Works Plant, including releases into the air. This action is brought for individual claims and pursuant to Rule 23 of the Federal Rules of Civil Procedure, as a class action on behalf of the named Plaintiff and on behalf of all individuals who, as of the time a class is certified in this case have an ownership interest in a private well within a two to a five-mile radius of the Chambers Works Plant, which contains drinking water containing PFOS and/or PFOA.

4.  Defendants knew or should have known that PFOA/PFOS are persistent when released into the environment and present significant risks to groundwater, drinking water supplies and human health.

5.  DuPont and Chemours used PFOS and PFOA at its Chambers Works plant in a manner that resulted in the release of PFOS/PFOA into the environment.

6.  3M marketed and sold PFOS/PFOA with the knowledge that PFOS/PFOA would be released into the environment.

7.  Through this action, Plaintiff seeks compensatory damages to his and the class members' property, including diminution in value and for the costs to investigate the extent of the PFOA/PFOS contamination, clean-up, remediation, filtration, treatment, engineering and to

monitor PFOS/PFOA contamination on class properties, as well as treble and punitive damages and reasonable attorneys' fees and costs.

## II. JURISDICTION AND VENUE

8. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

9. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## III. PARTIES

10. Plaintiff Geoffrey I. Roberts owns and resides at property located at 3 Isabelle St., Pedricktown, NJ 08067.

11. Plaintiff's property and drinkingter supply is contaminated with PFOS/PFOA.

12. Defendant, E. I. du Pont de Nemours & Co., is a Delaware corporation and does business throughout the United States, including conducting business in New Jersey. DuPont has its principal place of business in Wilmington, Delaware.

13. Defendant, The Chemours Company FC, LLC, is a Delaware corporation and does business throughout the United States, including conducting business in New Jersey. DuPont has its principal place of business in Wilmington, Delaware. Chemours is a multinational chemical manufacturer. Chemours, including its assets and liability, was wholly owned by DuPont when Chemours acquired the Chambers Work site from DuPont on or about July 2015, when it separated from DuPont. During the time Chemours has owned and operated Chambers Works, it has discharged PFOA/PFOS into the environment.

14. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware and does

3

business throughout the United States, including conducting business in New Jersey. 3M has its principal place of business in St. Paul, Minnesota.

15. Upon information and belief, 3M marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used PFOS that is the subject of this Complaint, including in New Jersey and this District, in such a way as to result in the contamination of Plaintiff's property and drinking water supplies.

## IV.   FACTUAL ALLEGATIONS

16. PFOS/PFOA are a class of non-naturally-occurring, man-made chemical that was first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

17. Defendants marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used PFOS/PFOA, including in New Jersey and this District, in such a way as to cause the contamination of Plaintiff's property and his drinking water.

18. Prior to commercial development and large-scale manufacture and use of PFOS/PFOA, no such PFOS/PFOA had been found, detected, or were present in the environment or in Plaintiff's drinking water.

19. By at least the end of the 1960s, animal toxicity testing performed by Defendants manufacturing and/or using PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

20. By at least the end of the 1960s, additional research and testing performed by Defendants manufacturing and/or using PFOA, because of their unique chemical structure, were

resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

21. By at least the end of the 1970s, research and testing performed by Defendants indicated that PFOS and PFOA, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where it would not only remain and persist over long periods of time but would accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small.

22. Defendants' manufacturing and/or distributing or sale of PFOS/PFOA resulted in the release of PFOS/PFOA into the environment, including in New Jersey and this District, that Defendants knew, foresaw, and/or reasonably should have known and/or foreseen would contaminate the environment including but not limited to the groundwater relied upon by Plaintiff for his drinking water.

23. By at least the end of the 1970s, 3M was aware that PFOS/PFOA, had been detected not only in the blood of workers at its manufacturing facilities, but in the blood of the general population of the United States in people not known to be working at or living near PFOS/PFOA manufacturing and/or use facilities, indicating to such Defendants that continued manufacture and use of such materials would inevitably result in continued and increased levels of PFOS/PFOA getting into the environment.

24. By at least the end of the 1980s, 3M understood that, not only did PFOS get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, had a long half-life, meaning that it would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposures), which

allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposures continued.

25. By at least 2010, additional research and testing performed by 3M and DuPont revealed multiple potential adverse health impacts among workers exposed to such PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFOA exposures were causing those effects.

26. At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFOA/PFOS any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

27. At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with PFOS/PFOA.

28. According to a deposition transcript from a lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for damages to the state's natural resources from PFOA/PFOS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects from the chemicals. 3M documents from 1977 relating to these worker tests

further confirmed that PFAS bioaccumulates.

29. A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

30. Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

31. A technical journal in 1970 observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

32. In 1979, a 3M scientist recognized in Interoffice Correspondence that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

33. According to the Minnesota Attorney General's allegations in the Minn. Lawsuit, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

34. According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

35. The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

36. A key priority of an internal 3M committee—referred to as the FC Core Team—

7

was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

37.     In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

38.     A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript from the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

39.     According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

40.     According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

41.     According to Professor Giesy's deposition transcript from the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net

8

worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

42. Under pressure from the federal Environmental Protection Agency ("EPA"), on May 16, 2000, 3M announced it would phase out production of PFOS and PFOA, in part, because of the chemicals' biopersistence.

43. An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term . . . . *[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree*." (emphasis added).

44. On May 25, 2016, EPA issued a Notice of its revised lifetime health advisory for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion) for PFOS and PFOA. Because these two chemicals cause similar types of adverse health effects, EPA recommends that when both PFOS and PFOA are found in drinking water the combined concentrations of PFOS and PFOA be compared with the 0.07 part per billion HA level."

45. On November 1, 2017, the New Jersey Department of Environmental Protection accepted the New Jersey Drinking Water Quality Institute's recommended drinking water standard of 14 parts per trillion for PFOA.

46. Defendants were and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that its marketing, development, manufacture, distribution, release, training of users, production of instructional materials, sale and/or other handling and/or

use of PFOS/PFOA containing materials, including in New Jersey and this District, would result in the contamination of groundwater including groundwater used by Plaintiff as his drinking water supply.

47. Defendants were and/or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFOS/PFOA materials to contaminate the environment would cause injury to Plaintiff.

## V. CLASS ACTION ALLEGATIONS

48. Plaintiff incorporates all the foregoing paragraphs as though the same were set forth at length herein.

49. Plaintiff brings this action as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1) and (b)(2). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

50. Plaintiff brings this lawsuit as a class action on behalf of the following class, as set forth below:

> Anyone who <u>as of the date of Class Notice of the Settlement</u> has an ownership interest (meaning owns or leases) in and occupies a residence located within two to five miles of the Chambers Works Plant that has a private well for drinking water that contains PFOS and/or PFOA.

51. Excluded from the Class are: (a) Defendants' legal representatives, employees, officers and/or directors; (b) the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; (c) any class counsel or their immediate family; and (d) class members who have already released their claims pertaining to the PFAS that are the subject of this Complaint (as to the specific PFAS that are the subject of the release(s) and the specific parties and claims that are covered by such release(s)).

10

52. Plaintiff reserves the right to amend the class definition set forth above if discovery and/or further investigation reveals that the Class should be expanded, divided into subclasses, or modified in any way.

53. The definition of the Class is unambiguous. Plaintiff is a member of the Class that he seeks to represent.

54. Class members are so numerous that individual joinder is impracticable. The precise number of Class members is unknown to Plaintiff, but it is clear the number greatly exceeds the number to make joinder possible.

55. The resolution of the claims of class members in a single action will provide substantial benefits to all parties and the Court.

56. Plaintiff's claims are typical of the claims of all the members of the proposed Class; like all proposed class members, Plaintiff owns property in the class area that has detectable levels of PFOA and/or PFOA in his drinking water.

57. Moreover, the factual bases of Defendants' acts and/or omissions are common to all members of the proposed Class.

58. Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.

59. Plaintiff has retained counsel with substantial experience litigating environmental torts, and specifically environmental torts involving PFAS, as well as class actions.

60. Common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

    a.    Whether Defendants owed a duty to Plaintiff and members of the Class to refrain from acts and/or omissions reasonably likely to result in PFAS in the drinking water of Plaintiff and the members of the Class;

    b.    Whether Defendants knew, foresaw, anticipated and/or should have known, anticipated, and/or foreseen that it was unreasonably dangerous to engage in acts and/or omissions that resulted in the presence of PFOA/PFOS in the drinking water of Plaintiff and the members of the Class;

    c.    Whether Defendants knew, anticipated, foresaw, and/or should have known, anticipated, and/or foresaw that their acts and/or omissions were likely to result in PFOS/PFOA in the drinking water of Plaintiff and the members of the Class;

    d.    Whether Defendants' acts and/or omissions proximately caused PFOS/PFOA to contaminate the drinking water of Plaintiff and the members of the Class;

    e.    Whether the presence of PFOS/PFOA in Plaintiff's and the class members' drinking water supplies is injurious, offensive, and/or otherwise harmful to Plaintiff and the class members; and

    f.    Whether Defendants' conduct is resulting in irreparable harm to Plaintiff and the class members; and

    g.    Whether Defendants' conduct warrants injunctive relief.

61.    Plaintiff and members of the Class all own property with wells containing PFOS/PFOA. A class action is superior to other methods for the fair and efficient adjudication of this controversy.

62. Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law.

63. Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

### COUNT I
### **FIRST CLAIM FOR RELIEF**
**(Negligence)**

64. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

65. Defendants had a duty to exercise reasonable care in their design, engineering, manufacture, development, fabrication, testing, release, training of users, production of informational materials, handling, selling, use, and/or distribution of PFAS, including a duty of care to ensure that PFOA/PFOS did not pollute the environment thereby contaminating the property and drinking water of Plaintiff and members of the proposed Class.

66. Defendants owed a duty of care towards Plaintiff and members of the proposed Class that was commensurate with the inherently dangerous, harmful, injurious, environmentally-persistent, toxic, and bio-accumulative nature of PFOS/PFOA.

67. Defendants failed to exercise ordinary care by acts and/or omissions that permitted, allowed, and/or otherwise resulted in the contamination of the property and drinking water of Plaintiff and the other class members with PFOS/PFOA, including all such acts and/or omissions referenced in this Complaint.

68. Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users, production of informational materials, handling, use, and/or distribution of PFOS/PFOA and/or

other acts and/or omissions as described in this Complaint could likely result in the contamination of Plaintiff's and the proposed class members' properties.

69. Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFOS/PFOA, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in the contamination of the property and drinking water of Plaintiff and the other class members with PFOS/PFOA.

70. Defendants, through their acts and/or omissions as described in this Complaint, breached their duty to Plaintiff and the members of the proposed Class.

71. It was reasonably foreseeable to Defendants that Plaintiff, and the members of the proposed Class, would likely suffer the injuries and harm described in this Complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

72. But for Defendants' negligent acts and/or omissions, Plaintiff and members of the proposed class would not have been injured or harmed.

73. Defendants' negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff and the proposed class members, as described herein.

## COUNT II
## SECOND CLAIM FOR RELIEF
**(Gross negligence, reckless, willful and wanton conduct; claim for Exemplary or Punitive Damages)**

74. Plaintiff and the other Class members incorporate the allegations contained in all prior paragraphs of this Complaint as if fully stated herein.

75. At all times pertinent hereto, the conduct of Defendants in causing, permitting, and allowing the release of PFOA/PFOS into the environment, thereby contaminating the drinking water of Plaintiff and the other Class members was more than simple negligence, momentary

thoughtlessness, inadvertence, or error of judgment on the part of Defendants. Instead, Defendants' conduct constitutes such an entire want of care and conscious indifference to the rights, welfare, safety, and health of Plaintiff and the other Class members such that Defendants' acts constitute gross negligence.

76. Defendants' grossly negligent acts and omissions proximately caused and continue to proximately cause damage to Plaintiff and other Class members in the form of property damage, in addition to creating conditions that are harmful to human health and the environment.

77. Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to Plaintiff and other Class members and a reckless indifference to their welfare.

78. Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of the Plaintiff and other Class members so as to warrant the imposition of punitive damages.

## COUNT III
## THIRD CLAIM FOR RELIEF
**(Private Nuisance)**

79. Plaintiff and the other Class members incorporate herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

80. Defendants' acts and omissions with respect to the releases of PFOS/PFOA caused and/or continue to cause a material, substantial, and/or unreasonable interference with Plaintiff's and the other Class members' use and/or enjoyment of their properties and has materially diminished and/or continues to diminish the value of such properties.

81.     Defendants' material, substantial, and/or unreasonable interference with the use and/or enjoyment of Plaintiff's and the other Class members' properties and/or continuing substantial and/or unreasonable interference with such use and/or enjoyment constitutes a continuing private nuisance.

82.     Defendants' creation and/or continuing creation of a continuing private nuisance proximately caused and/or continues to proximately cause damage to Plaintiff and the other Class members in the form of property damage of a type special and common to members of the Class but not common to the general public, for which Defendants are liable.

## COUNT IV
## FOURTH CLAIM FOR RELIEF
### (Past and Continuing Trespass)

83.     Plaintiff and the other Class members incorporate herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

84.     Defendants' intentional acts and/or omissions have resulted and/or continue to result in the unlawful release and/or threatened release of PFOS/PFOA under, onto, and/or into Plaintiff's and the other Class members' lawfully possessed properties.

85.     The PFOS/PFOA present on Plaintiff's and the other Class members' properties originating from the Chambers Works Plant were at all relevant times hereto, and continue to be, the property of Defendants.

86.     The invasion and presence of the PFOS/PFOA at, under and/or onto Plaintiff's and the other Class members' properties and/or bodies were and continue to be without permission or authority from Plaintiff or any of the other Class members or anyone who could grant such permission or authority.

87.     The presence and continuing presence of PFOS/PFOA on Plaintiff's and the other Class members' properties constitute a continuing trespass.

88. Defendants' past and continuing trespass upon Plaintiff's and the other Class members' properties has proximately caused and/or continues to proximately cause damage to Plaintiffs and the other Class members in the form of property damage, for which Defendants are liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Enter judgment in its favor and against Defendants on each Count of this Complaint;

B. An order that Defendants pay all damages suffered by Plaintiff and the proposed class members, including but not limited to diminution in property value, investigation into the extent of PFOA/PFOS contamination, clean-up, abatement, remediation, engineering, treatment and monitoring costs incurred by Plaintiff as a result of PFOS/PFOA contamination;

C. An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

D. An award for treble and punitive damages; and

E. An award of pre-judgment and post-judgment interest, as provided by law; and

F. An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Geoffrey I. Roberts
By His Attorneys

s/ Michael A. London
Michael A. London
*New Jersey Attorney ID # 048501997*

17

        Rebecca G. Newman
*New Jersey Attorney ID # 033202008*
DOUGLAS & LONDON, PC
59 Maiden Lane
New York, NY 10038
Tel: (212) 566-7500
Fax: (212) 566-7501
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com

        -and-

Albert I. Telsey
*New Jersey Attorney ID #016961985*
Meyner and Landis LLP
One Gateway Center Suite 2500
Newark, New Jersey 07102
Tel: (973) 624-2800
Fax: (973) 624-0356
atelsey@meyner.com

DATED: October 17, 2018